# Birmingham Water Works Company v. City of Birmingham.

*Bill to Compel the Discharge of a Public Duty.*

(Decided April 4, 1912.   58 South. 204.)

*Waters and Watercourses; Public Supply; Contract; Construction.*—The franchise and contract considered, and it is held that as the contract ran for thirty years, the provisions as to the facilities required were temporary, and were not qualification of defendant's general duty to serve as the exigencies of the future might require, and that the water works company was bound to install facilities to supply an elevated district of the city which had become populous through the growth of the city.

(Simpson, J., dissents.)

APPEAL from Jefferson Chancery Court.

Heard before Hon. A. H. BENNERS.

Bill by the city of Birmingham against the Birmingham Water Works Company to require it to perform a

public duty in furnishing an adequate water supply to a portion of the city which had become populous through natural growth. Decree for complainants and respondent appeals. Affirmed.

LONDON & FITTS, for appellant. But one question is presented, and that is, whether under its contract, the city water works is bound to supply a certain elevated territory with an adequate supply of water. The agreement is within the protection of the state and Federal Constitutions, and is therefore, to be treated and construed as a contract.—115 U. S. 650; 115 U. S. 674; 120 U. S. 64; 172 U. S. 1; 177 U. S. 58; 184 U. S. 368; 194 U. S. 517. It follows that the contract cannot be abrogated or its terms changed by the construction sought to be given it by the bill filed in this case, and that no duty rests upon the company to furnish any facilities other than those contracted for.

A. G. & E. D. SMITH, for appellee. The contract was for public service and the facilities required were temporary, and not to be construed as not requiring the company to furnish portions of the city with water as its growth and extension might require.—*Harbor Master v. Sutherland,* 47 Ala. 511; *Port of Mobile v. Railroad,* 84 Ala. 115; *Cocciola v. Wood-Dickerson,* 136 Ala. 532; *Thompson v. State,* 20 Ala. 54; *Huffman v. State,* 29 Ala. 40; *Bir. St. Ry. Cases,* 79 Ala. 464; 180 U. S. 587; Ib. 619; Ib. 624; 73 N. W. 248; 46 N. J. L. 493; 29 S. W. 1056; 64 N. W. 711; 97 Pa. St. 555; 19 L. R. A. (N. S.) 183.

SOMERVILLE, J.—The bill was filed by the city of Birmingham against the Birmingham Waterworks Company, under section 3513 of the Code, for the purpose of compelling respondent to discharge an alleged

public duty, viz., to furnish water sufficient in quantity for the use of the citizens of Birmingham, with especial reference to those dwelling at an altitude of 240 feet above the datum line of the city. The alternative prayer of the bill is for a forfeiture of respondent's franchise and a dissolution of its corporate existence.

The cause was submitted on an agreed statement of facts, and the chancellor held that a breach of respondent's contract with the city was shown, and that the city was entitled to the relief prayed for. The appeal is from that decree, and the only question presented is whether, under its charter from the state and its franchise contract with the city of Birmingham, respondent is obligated to furnish a sufficient supply of water to the inhabitants of a certain residence section of Birmingham, on the north flank of Red Mountain.

The Birmingham Waterworks Company is a private corporation chartered for public service by legislative act approved February 13, 1885.—Sess. Acts 1884-85, p. 415. The preamble to that act is: "Whereas, it will greatly promote the health and comfort of the citizens of Birmingham, in Jefferson county, Alabama, and its suburbs, to have an ample supply of good and pure water, and the same is greatly needed; and, whereas, the Birmingham Waterworks Company desires to be incorporated to supply it," etc. Section 2 declares that "the object and business of said company shall be to establish and construct waterworks within or near the corporate limits of said city of Birmingham, and to send and distribute water throughout the said city and places adjacent thereto." The act also confers on the company liberal and extensive powers of eminent domain for the accomplishment of its declared objects, and also the right to make contracts with individuals and corporations for supplying water to them.

In 1888 the city council of Birmingham adopted an ordinance "to provide for a more efficient system of waterworks for the city of Birmingham, Alabama." The provisions of this ordinance were adopted on June 2, 1888, as a contract by and between the city and the waterworks company, and this contract still remains in force. The ordinance consists of 23 sections, of which the following are perhaps directly pertinent to the present issue:

"Section 1. Be it ordained by the mayor and aldermen of Birmingham, that the Birmingham Waterworks Company, a corporation, incorporated under the laws of the state of Alabama, the successors and assignees of the Elyton Land Company as to all of its rights, franchises and privileges, its successors and assigns, is hereby authorized and empowered to erect and maintain one or more suitable waterworks pumping stations in or near said city of Birmingham, and to lay down, maintain and use water mains, pipes, aqueducts and other fixtures to, in and through any of the streets, avenues, alleys and public grounds in said city, for the conveyance of water in and through said city, for the use of said city and its inhabitants as herein provided."

"Sec. 3. Be it further ordained, that the water so furnished shall be clear, wholesome and suitable for all domestic and ordinary manufacturing purposes and sufficient in quantity for the uses of said city and its inhabitants and for all manufacturing purposes."

"Sec. 5. Be it further ordained, that in addition to the pumping station and machinery now in use, consisting of an aggregate capacity of not less than five million gallons daily, located on Village creek, there shall be another pumping station established on Cahaba river, provided with pumping machinery capable of delivering not less than five million gallons daily into the

city of Birmingham, under a static pressure due to not less than two hundred and twenty feet head: Provided, further, that at any future time after the completion of the works contemplated on Cahaba river, the said pumping station now located on Village creek may be dispensed with at the discretion of the said water company, and the use of the reservoir now in use may be discontinued."

"Sec. 7.   Be it further ordained, that in addition to the reservoir now in use, there shall be constructed, either on Shades Mountain or Red Mountain, a reservoir of not less capacity than twenty-five million gallons, the surface level of the water in said reservoir when full to be not less than three hundred and twenty feet above city datum, and the level of the water in said reservoir shall never be permitted to fall below an elevation of three hundred feet above said city datum. All of said works and extensions are to be completed and put into operation as soon as practicable, not later than April 1, 1891."

Respondent has always adequately and satisfactorily supplied the people of Birmingham in general with wholesome water, and has failed to do so only as to the specified residence section on Red Mountain. This section is now thickly settled and built up with about 150 residences of the best type, occupied by about 750 people. Respondent's water mains run into this section, the city has placed about 25 fire hydrants there, and its sewer system has been extended through it, and the dwellings have been connected therewith. The mains are full of water; but, for lack of pressure, the water is unavailable for fire hydrants or sewerage and domestic purposes. Respondent has the money and means to erect a standpipe on Red Mountain, which will adequately supply water for these purposes, and such a

structure is thoroughly practicable, in view of the location of respondent's other plants and mains; but, owing to the cost of such a standpipe, and of the double pumpage thereby entailed, respondent would derive no profit from supplying water to the city or to private consumers in this elevated territory.

When respondent received its grant of franchises and entered into this contract with complainant in 1888, the city of Birmingham had a population of about 25,000, and lay entirely within Jones valley, between a range of hills, called North Highlands, on the north, and another range, called South Highlands and Red Mountain, on the south. Since 1888 the limits of the city have been successively extended, until at the time this bill was filed they included these Highlands and the north side of Red Mountain, with a population of about 50,000.

Respondent's contention is that, although its contract for water service contemplated the natural growth of the city, both in area and population, yet it was never intended to extend that service to such a locality as this elevated section of Red Mountain; the argument being, in substance, that its general obligation to furnish an adequate supply of water "for the uses of said city and its inhabitants" is qualified and controlled by the specific requirements of sections 5 and 7 of the ordinance, and that a just and rational interpretation of the contract, in the light of contemporaneous conditions, would not require of respondent a service not within the facilities of the plant it was then required to establish.

This argument is not without force and plausibility, but we think it is nevertheless unsound. The contract was to run for 30 years, and therefore must have contemplated such an extension of the territory to be served as might occur in that long reach of time. We judi-

[Birmingham Water Works Company v. City of Birmingham.]

cially know that 1888 was a "boom" year for towns that had sprung up or already existed throughout the mineral sections of the state, and that Birmingham was even then regarded as the embryo of a great city, and was entering upon a period of remarkable growth and expansion.

Respondent voluntarily assumed the duty of an important and essential public service, which was, indeed, its very raison d'etre, in return for which it was clothed with sovereign powers and invested with potentially profitable franchises by both state and city. Upon the faithful discharge of this duty depends, as the preamble to its charter declares, "the health and comfort of the citizens of Birmingham," and it cannot justly be permitted to render that service when and where it is found to be profitable, and to omit it when and where it deems the service inconvenient or unremunerative. It would be a narrow and unreasonable construction of the provision for general and continued service to the city and its inhabitants to hold that the equipment required to be originally provided should measure for all time the extent of that service. The object of sections 5 and 7 was evidently to make certain an initial service that would be adequate and satisfactory, as a condition precedent to the operation of the contract and the enjoyment by respondent of its privileges and perquisites. In other words, these requirements were but details of more or less temporary expediency, and not qualifications of respondent's general duty to serve as the exigencies of the future might require.

It is not necessary to invoke any special rules of construction; for, dealing with this ordinance as an ordinary contract, and having in view the purposes declared therein, and the language in which its obligations are expressed, we think it very clearly imposes upon re-

spondent the duty with which complainant seeks to charge it by this proceeding. The decree of the chancellor will therefore be affirmed.

Affirmed.

DOWDELL, C. J., and ANDERSON and SAYRE, JJ., concur. SIMPSON, J., dissents.